IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARILYN SEIFERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-551 |
| | ) | |
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| HUMAN RELATIONS COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge

In this memorandum opinion, the court considers the motion for summary judgment

(Doc. No. 21) filed by defendant Commonwealth of Pennsylvania Human Relations Commission

("defendant" or "PHRC").  Plaintiff Marilyn Seifert ("plaintiff" or "Seifert") asserted one claim

against defendant for retaliation in violation of the Family and Medical Leave Act of 1993, as

amended, 29  U.S.C. §§ 2601 *et seq*. ("FMLA").  Defendant's motion seeks summary judgment

in favor of defendant with respect to plaintiff's sole claim premised upon the argument that the

two-year statute of limitations applicable to FMLA actions in general, 29 U.S.C. § 2617(c)(1),

expired prior to the filing of this lawsuit and that plaintiff must show a willful violation of the

FMLA in order to bring this action within the three-year statute of limitations set forth in 29

U.S.C. §2617(c)(1)(2).  Defendant argues plaintiff failed to adduce evidence that defendant acted

wilfully and thus summary judgment should be granted in its favor because plaintiff's claim is

time-barred under the two-year statute of limitations.  After considering the submissions of the

parties, the court determines that no reasonable finder of fact could find defendant acted willfully

in violation of the FMLA and will grant summary judgment in favor of defendant.

### *Factual Background*[1]

**PHRC Policies**

Plaintiff admitted that the following PHRC policies existed, but denied that they were

consistently followed or enforced in the office where she worked:

The PHRC's Western Regional Office[2] has an administrative policy governing time and attendance which requires all employees to sign in when they arrive each morning and sign out at the end of the day.  (Id. at 9.)

Except in emergencies, all leave usage by an employee requires pre-approval by the employee's immediate supervisor.  An STD 330, commonly referred to as a "leave slip", is the standard form utilized by the Commonwealth of Pennsylvania and the PHRC to request leave and account for time out of the office during normal working hours at all times relevant to this matter.  (Id.)

Under standard Commonwealth, PHRC and Pittsburgh Regional Office policy, each employee is required to complete a leave slip in advance indicating the amount of time they contemplate taking.  (Id.)

The leave slip is to be signed by the employee and the employee's supervisor and submitted to Harrisburg by the leave clerk with the employee's official time and attendance report twice monthly at the end of every pay period. (Id. at 10.)

The only exception for not having a leave slip signed by the supervisor in advance of taking leave is if there is a legitimate emergency.  In that case, the leave slip is to be completed by the employee immediately upon his or her return to the office.  (Id.)

The PHRC follows a form of progressive discipline which begins with verbal reprimands or counseling, followed by written reprimands and, if necessary, suspension or discharge. (Id. at 11.)

---

[1]The statements contained in this Factual Background were taken in the most part verbatim from the Joint Concise Statement of Material Facts.  (Doc. No. 29.)

[2]PHRC's Western Regional office is sometimes referred to as the "Pittsburgh Office" or the "Pittsburgh Regional Office."

**Plaintiff's Employment Background**

George Simmons ("Simmons") is the regional director of the PHRC Western Regional Office located in Pittsburgh, Pennsylvania  and has held that position for the past thirty-two years.  (Doc. No. 29, Joint Concise Statement of Material Facts ("J.S.") at 2.)  As the regional director, Simmons manages and directs the operations of the PHRC for thirty-three counties in Western Pennsylvania.  (Id.)  Dr. Iris Cooley ("Cooley") was the personnel director/director of human resources for the PHRC from 1982 until her retirement in May 2003.  (Id.)  Human resources is located at PHRC headquarters in Harrisburg, Pennsylvania and oversees all employment related issues, including hiring, training, time and attendance, payroll and benefits for all employees throughout the Commonwealth of Pennsylvania.  (Id.)  Homer C. Floyd ("Floyd") is the executive director of the PHRC and has held that position since February 1970. (Id. at 3.)  As executive director, Floyd is responsible for directing the overall operations of the PHRC.  Among other things, he recommends policy to the commissioners of the PHRC, oversees implementation of policy, approves programs and budget expenditures, and makes the final decisions regarding hiring, promotion and the suspension or termination of PHRC employees. (Id.)

In 1992, after an interview with Simmons and others, Seifert was hired to fill the vacant position of administrative officer for the PHRC Western Regional Office.  (Id.)  The administrative officer  position is a highly demanding, management level, confidential position, with responsibility for a wide variety of administrative duties, including ensuring the smooth operation of the office.  (Id.)  Simmons was plaintiff's boss and immediate supervisor.  (Id. at 7.) Seifert was provided with a written job description and had a clear understanding of her duties

before she accepted the position.  (<u>Id.</u> at 3.)  She understood that her position was to assist

Simmons in the day-to-day management of the office and that Simmons was her boss and

immediate supervisor.  (<u>Id.</u>)  Seifert did not sign in everyday when she arrived at the office.  (<u>Id.</u>)

After her first couple of years of employment, Seifert requested a promotion to Administrative

Officer II which was denied.  (<u>Id.</u> at 5.)  Plaintiff's employment with the PHRC was terminated

effective April 12, 2002.  (<u>Id.</u> at 19.)

**<u>Leave and Leave Clerk Duties</u>**

     The Commonwealth provides a paid and unpaid leave program for its employees.  (Id. at

4).  The major categories of paid leave include annual, personal, sick and sick family.  The rules

and regulations regarding paid leave are set forth in the Governor's Manual.  (<u>Id.</u>)   All time that

a Commonwealth employee is absent from the work place for more than .25 hours is to be

appropriately recorded and charged to a specific, Commonwealth approved leave category.  (<u>Id.</u>)

Under Commonwealth policy, proof of illness in the form of a certificate from a doctor is

required when three or more consecutive days of sick leave or sick family leave are used.  (<u>Id.</u> at

5.)  Each employee is responsible for maintaining his or her own time and attendance records and

for obtaining the appropriate leave slips documenting approval for leave.  (<u>Id.</u>)  Defendant's

policy on payroll required employees to sign timesheets showing hours actually worked and

countersigned by the immediate supervisor.  (<u>Id.</u> at 8.)  Payroll was actually calculated based on

fax transmittals to the head office in Harrisburg and the fax transmittals were based on the

information on the timesheets, which would be forwarded by mail.  (<u>Id.</u>)  The Commonwealth

time and attendance rules apply to all Commonwealth employees, including Simmons.  (<u>Id.</u>)

Leave attributed to time taken under the FMLA is to be designated as "FL" on the leave slip and

the time and attendance report although time taken under the FMLA could also be coded as sick or annual leave with pay if the employee had such leave available.  (Id. at 15.)

Shortly after plaintiff began her employment, responsibility for reporting time and attendance for the Western Regional Office was transferred into her job description and she officially became the "leave clerk" for the Pittsburgh office.  (Id. at 4.)  The leave clerk is charged with responsibility for administering the Commonwealth of Pennsylvania attendance/leave and holiday programs and for promptly and accurately reporting leave usage for all employees in the Pittsburgh office except the regional director.  (Id.)  The leave clerk is responsible for gathering leave slips from the supervisors, attaching them to the employees' time and attendance sheets and timely submitting them to human resources at the end of every pay period, for monitoring the employees' compliance with the Commonwealth and PHRC time, attendance, and leave policies and the employees' leave usage and for reporting any abuse or misuse of time and attendance by any employees. The time and attendance reports are the basis for the pay issued to each employee.  (Id. at 10.)  Supervisors, like Simmons, are also responsible for verifying that employees' records are accurate before signing them prior to submitting them to the leave clerk.  (Id. at 11.)

As the leave clerk/administrative officer, Seifert had all the Commonwealth manuals and directives available to her in her office and she was well acquainted with the different types of leave and the policies and procedures to be followed in requesting, recording and reporting leave usage and balances.  (Id. at 4.)  Simmons lost leave slips submitted to him and other employees made reporting errors.  In such instances, plaintiff would have to recreate leave slips.  (Id. at 10.) In July and September 2001, plaintiff received notices from human resources that numerous

employees and supervisors in the Pittsburgh office were not properly submitting time and attendance records.  (Id. at 8.)  The leave reporting for the Pittsburgh Regional Office was replete with problems and Seifert and Simmons received numerous calls from Harrisburg about the leave reporting for the Pittsburgh office.  (Id. at 5.)

In the summer of 2001, more than one-third of the employees in the Pittsburgh office had noncompliant time records, but no action was taken against any employee except for plaintiff, who was the leave clerk.  (Id. at 25.)  Plaintiff addressed memos to Simmons with copies to Cooley requesting his cooperation and assistance in correcting these problems, but received none. (Id. at 23.)  When she received the complaints from Harrisburg regarding employee time records in July 2001 and September 2001, plaintiff was not informed that there was any problem with her own time records.  (Id. at 24.)  Prior to October 2001, Cooley had not been made aware that there was any big issue with regard to plaintiff's time and attendance records and if any major problem existed, it was not documented.  (Id. at 24.)

**Relationship Between Simmons and Plaintiff**

Simmons expressed irritation with Seifert in 1996 for not being in the office when she was supposed to be there and not submitting leave slips.  This was a persistent problem but Simmons signed all of plaintiff's time sheets, which was his certification that her leave slips were in order.  (Id. at 12.)  In 1996, Simmons perceived that Seifert was arriving late, leaving early, disappearing from the office and not putting in leave slips.  (Id. at 13.)  In April 1996, plaintiff took an extended medical leave due to personal illness.  (Id. at 20.)

In Cooley's judgment, the conduct Simmons had engaged in toward plaintiff, resulting in plaintiff's complaint of January 30, 1997, was sufficient to expose defendant to a charge of

disability discrimination.  (Id. at 20.)  Cooley went on to point out that, although Simmons had complained about plaintiff in the past, he had never instituted disciplinary action, nor completed a performance evaluation for plaintiff.  (Id.)  Cooley also stated that Simmons had been complaining about plaintiff's performance since he hired her.  (Id. at 21.)

In a memo dated February 4, 1997, Seifert summarized a meeting at which Simmons berated her for "poor performance, lack of accountability, and leave and attendance history." Seifert complained of unconscionable and unfair treatment by Simmons and attributed this to her "medical condition."  (Id. at 5.)  In 1996 and 1997 the working relationship between Seifert and Simmons was deteriorating.  (Id.)  After discussing the matters set forth in plaintiff's memo of February 4, 1997 with plaintiff and Simmons, Cooley reported her conclusions to Floyd in a memo dated February 7, 1997.  (Id. 5, 20.)  Cooley informed Floyd of the deteriorating relationship.  (Id. at 5.)

Throughout their working relationship, there was mutual distrust between Seifert and Simmons.  Simmons perceived continuing problems with Seifert's performance, attendance and leave.  He frequently complained to her that he could never find her and they exchanged words about it. (Id. at 13.)  Simmons consulted Cooley for advice and instructions on how to handle his employment problems with Seifert.  (Id. at 5.)  While Cooley was not helpful, Seifert consulted Cooley "many times" for assistance in dealing with her problems with Simmons.  (Id. at 14.)

Commonwealth policy requires that each employee's immediate supervisor must complete a performance review on the employee for every year of employment.  (Id. at 21.) Simmons did not regularly conduct employee evaluations for any of his management level employees.  (Id.)  In the ten years that plaintiff was employed by defendant, although she

7

repeatedly requested the reviews to which she was entitled, Simmons completed only one review of plaintiff's performance, for the period from July 1997 to June 1998, in which he rated plaintiff's overall performance as satisfactory.  (Id.)  In that same review, Simmons rated her as "commendable", the second-highest rating possible, in the area of interaction with her co-workers.  (Id.)

**Encouragement to take and taking of FMLA Leave**

In 2000, Cooley encouraged plaintiff to consider taking leave under the FMLA. (Id. at 14.)  Cooley had suggested to Seifert that she consider taking time off under the FMLA on previous occasions.  (Id.)  By letter dated January 30, 2001, Cooley reminded Seifert that she may seek leave pursuant to the FMLA.  (Id. at 5.)

In March 2001, plaintiff requested and was granted FMLA leave to care for her mother, who was dying of cancer.  (Id. at 8.)  By memo dated March 21, 2001, Seifert requested approval of 37.5 hours of anticipated sick family and 37.5 hours annual leave for pay period ending March 9, 2001 and approval to take FMLA.  (Id. at 6.)  By letter dated March 27, 2001, Floyd approved Seifert's request, set forth her leave balances and her rights under the FMLA.  (Id.)  Floyd was always supportive of Seifert's requests for leave, including her request for FMLA leave.  (Id.)

An employee who has been approved for leave under the FMLA must continue to adhere to all the Commonwealth policies and procedures regarding leave, including submission of leave slips in advance and indicating the amount of time to be taken under the FMLA absent an emergency.  (Id.)  Even when an employee is approved for FMLA, he or she typically exhausts all available paid leave first, which is what plaintiff did in 2001.  (Id. at 22.)  In October 2001, plaintiff had exhausted her accumulated personal, sick and annual leave, and began instructing

the employees to whom she called off to submit her leave requests as FMLA leave without pay. (Id. at 23.)

       Seifert's mother was hospitalized from February 28, 2001 through late May 2001.  She was in the intensive care unit at Mercy Hospital for the first thirty-two days and was hospitalized the majority of the time until she died on January 29, 2002.  (Id. at 6.)  Because the course of her mother's illness was unpredictable, plaintiff could not always request leave in advance, but from March 2001 through October 2001, she would always notify Simmons that she was taking the pre-approved leave.  (Id. at 22.)  Because Simmons was frequently out of the office, plaintiff left messages for him as to her leave usage rather than speaking with him directly, but she always submitted or recreated leave slips.  (Id.)  Leave slips indicating the supervisor's approval of leave taken as shown on the timesheet were submitted with the timesheets.  (Id.)  The supervisor's signature on the time sheet verifies that the information on the timesheet is correct and that the supervisor has received and approved a leave slip for all leave indicated on the timesheet.  (Id. at 23.)

       Simmons signed all of plaintiff's timesheets that were submitted to Harrisburg, verifying that the leave information was correct and that he had received a leave slip from plaintiff.  (Id.) Moreover, all plaintiff's timesheets were countersigned by Simmons, verifying their accuracy, for which he was responsible.  (Id. at 24.)  Simmons signed off on each and every disputed timesheet and it was his job to verify that they were accurate before signing.  (Id. at 25.)  Seifert's time and attendance reports from March 21, 2001 through early May 2001 reported that, with the occasional day off and reporting late periodically, she was at the office full time.  (Id. at 6.)

By memo dated September 24, 2001, Seifert reminded Simmons of continuing problems with leave submission in the Pittsburgh office.  (Id.)  During the entire period of 2001 when she was utilizing her pre-approved FMLA leave, Simmons was again treating her in a hostile and abusive  manner, causing her to again complain to Cooley in October 2001.  (Id. at 28.)  Although Simmons claims to have had problems with plaintiff's attendance and performance, it was Simmons who was abusive and inconsistent in his treatment of plaintiff.  Simmons often made unjustified accusations and blamed plaintiff for the errors of himself and others, causing plaintiff to register complaints to Harrisburg.  Neither Seifert nor Cooley was informed of any serious attendance problem until the later part of 2001.  (Id. at 25.)

Plaintiff was not informed of any specific attendance errors prior to late 2001, at which time she attempted to correct the errors, many of which had been made by others, and to reconstruct the missing leave slips.  (Id. at 28-29.)  After receiving a letter dated October 3, 2001, reprimanding her for failures relating to leave policies, Seifert went back and found some of the missing documents and recreated some of the leave slips for herself and other employees.  (Id. at 16.)  Seifert corrected several time and attendance reports by changing the leave code from paid annual, sick, personal or sick family to "FL" for all the leave she had entered after her request for FMLA was granted in March 2001 to reflect the time she considered as attributable to FMLA leave.  (Id.)  By letter dated October 24, 2001, after consultation with Floyd, Cooley offered to continue her efforts to be a "go between" with Simmons and to work with them both to get work relations back to a professional and courteous level.  (Id. at 6.)

Seifert believes that Cooley and Simmons were working together to document a paper trail to fire her in 2000 and 2001.  (Id. at 15.)  By memo dated January 2, 2002, Simmons relieved Seifert of her duties as leave clerk.  (Id. at 7.)

The record of absence for Seifert for the calendar year 2002 indicates that she was not in the office from January 4, 2002 through February 27, 2002.  The first time that unpaid leave under the FMLA was recorded on Seifert's time and attendance report was January 7, 2002.  (Id.)  Seifert's mother died on January 29, 2002.  (Id.)  Seifert did not return to work until February 28, 2002.  She "took some leave" after her mother's death because her father was ill.  (Id.)  Seifert did not apply for FMLA to care for her father, did not submit a request for leave and did not submit a doctor's certificate to verify her father's illness or his need for her assistance.  (Id. at 19.)[3]

**Memoranda and Correspondence sent to Plaintiff**

While denying the accuracy of statements contained in the following memoranda and correspondence, Seifert admits she received the memoranda and correspondence:

> On November 4, 1994, Seifert received a written counseling memo from Simmons regarding unsatisfactory performance in executing the essential duties of the job classification and for utilizing Commonwealth time and equipment for her personal business.  (Id. at 11.)
>
> On August 23, 1996, Seifert received a written reprimand for unauthorized absences from the work site and unsatisfactory work performance.  The reprimand stated that Seifert has been verbally counseled on many occasions regarding unexplained absences, failure to properly record absences on her time

---

[3]Plaintiff asserts that she requested FMLA leave in 2002 to care for her mother, which leave was denied by Simmons on March 6, 2002.  (J.S. at 29.)  That request, however, was granted previously with leave to continue until March 2002 and her mother died in January 2002.  (Id.)

and attendance, failure to have leave slips signed in advance and her "lack of availability to staff, attention to detail and work initiatives" and a "continuous disregard of agency procedures, office protocol and poor performance." (Id.)

By memo dated September 6, 1996, Cooley expressed concern to Seifert regarding her persistent tardiness and unexplained absences. Cooley requested medical documentation to verify Seifert's leave time based on a reaction to medication. Cooley suggested that plaintiff consider requesting leave time under the FMLA until her medical problems are under control and she is consistently able to work. (Id. at 12.)

By memo dated November 18, 1996, Simmons directed Seifert to change her work hours from 7:30 a.m. to 3:30 p.m. to 8:30 a.m. to 4:30 p.m. in an effort to resolve her problem of arriving late and being absent from the office for unexplained periods of time during the work day. Seifert was reminded that she was responsible for time and attendance of all Pittsburgh employees and was to report any abuse/misuse of time and attendance by any employees. (Id.)

Seifert received a written memo from Simmons dated January 14, 1997, complaining of unexplained and unauthorized absences from the office for extended periods without proper notation on the time sheet. According to the memo, "if the time sheet was noted, it was false." (Id. at 13.)

By memo dated January 24, 1997, Simmons directed Seifert to change her work hours from 9:00 a.m. to 5:00 p.m. to avoid consistently being late for work. (Id.)

Seifert received a written reprimand from Simmons dated October 2, 2000, for "persistent disregard for Commonwealth, Agency and Regional Office policies and procedures governing leave and attendance, as well as your failure to adequately perform the duties and responsibilities consistent with that of Administrative Officer I." Seifert was reprimanded for arriving late, leaving early and being "absent from your work station for inordinate amounts of time thereafter." (Id. at 14.)

By memo dated May 3, 2001, Seifert was counseled for her failure to sign in and out appropriately and for failure to account for her absences with leave slips. (Id. at 15.)

By letter dated October 3, 2001 to Seifert, Cooley documented continued infractions by Seifert of Commonwealth leave policy and advised Seifert that leave under the FMLA must be documented so that human resources can monitor the twelve-week usage. (Id.)

12

By memo dated October 4, 2001, Seifert was reprimanded by Simmons for her continued failure to comply with Commonwealth, PHRC and Pittsburgh Regional Office leave policies, including failure to submit leave slips, failure to sign in and out of the office and failure to maintain regular work hours or account for her absences with a leave slip.  (Id. at 16.)

By memo dated November 13, 2001, Seifert was reprimanded by Simmons for using profanity in the office in a conversation with another employee, Karen Spahr.  (Id. at 17.)

By memo dated November 14, 2001, Seifert was reprimanded for violations of leave reporting procedures and inconsistencies in her leave records and was placed on a leave restriction.  (Id.)

By memo dated December 20, 2001, Simmons asked Seifert to provide him with a leave slip for time out of the office.  (Id. at 18.)

.   By memo dated December 27, 2001, Cooley advised Simmons that human resources found irregularities in Seifert's leave balances which were the result of either faulty memory or falsification.  Simmons was directed to investigate her attendance sheets for the past six months and to monitor closely her time and attendance records.  (Id.)

On March 1, 2002, plaintiff was provided with a written memorandum and a two-page listing setting forth the abuses or irregularities found in her own personal leave for 2001 and 2002 and asked for a response.   There were 50 days on which leave was taken, but no leave slip was submitted.  There were six instances in which no time and attendance sheet was submitted and various other irregularities including failure to submit a doctor's certificate.  (Id. at 27.)

**Investigation**

In 2001, Cooley reported to Floyd that she had found serious and significant discrepancies in Seifert's time and attendance records although plaintiff denies that they were "serious" or "significant" in that they were no different than the errors common to many Pittsburgh employee records that were a problem.  (Id. at 17.)  At Floyd's request, human resources conducted an investigation into the time and attendance records of Seifert for 2001. (Id.)  Cooley presented Floyd with the results of the investigation which revealed that Seifert had

reported 454 hours of leave usage for 2001 when she had actually been absent from the office a total of 620.25 hours.  (Id. at 27.)[4]

The record of absence for Seifert for the calendar year 2001 indicates that she was in the office from March 27, 2001 through May 7, 2001.  She was out from May 7-14, 2001, June 11-15, 2001, August 13-31, 2001, September 4-7, 2001, and October 22-November 2, 2001.  She was in the office for the remainder of the year with the exception of one day in December 2001.  None of the leave time for the calendar year 2001 was recorded as FL.  (Id. at 18.)  Plaintiff, however, had requested that some of the leave be recorded as FMLA, but her requests were not implemented.  (Id.)  Simmons held a meeting with Seifert on February 28, 2002, regarding, *inter alia,* the investigation conducted by human resources into plaintiff's personal leave usage for 2001 and 2002.  (Id. at 19.)  Floyd personally reviewed the results of the investigation and concluded although all the original time and attendance sheets bore Simmons' signature, that the discrepancies on Seifert's entries were so egregious that they could not be the result of negligence or mistakes, but represented willful and deliberate falsification of official records.  (Id. at 28.)  Plaintiff denies that she falsified any record and that Floyd had any evidence of willful falsification.  (Id.)

By memo dated March 4, 2002, Seifert received a written reprimand from Simmons for additional violations of leave reporting.  (Id. at 19.)   By memo dated March 6, 2002, Seifert was advised that there were no provisions for a verbal extension of FMLA.  (Id. at 7.)  Seifert was out

---

[4]Plaintiff disputes this statement by referring to Simmons' records which showed a discrepancy of only 37.5 hours.  The 37.5 hours discrepancy was set forth in a memorandum dated December 13, 2001 and was prepared from the original records submitted by plaintiff.  (Id. at 29.)  The 37.5 hours discrepancy thus cannot be considered the result of the investigation by the human resources.

sick during the period from March 18, 2002 to March 19, 2002 and from March 25, 2002 through April 12, 2002.  No medical certificate was submitted for any of these absences.  (<u>Id.</u>)

By letter dated April 11, 2002 from Floyd, Seifert was notified that her employment with the PHRC was terminated effective April 12, 2002.  (<u>Id.</u>)  Floyd's action in terminating plaintiff was based on recommendations from Cooley and Simmons.  (<u>Id.</u> at 24.)  Floyd's termination letter cited "frequent and prolonged absences" as one of the bases for plaintiff's termination.  (<u>Id.</u> at 8.)

After exhausting her administrative remedies, plaintiff commenced this action.  The parties agree that if the two-year statute of limitations is applicable, plaintiff's claim would be time-barred.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at 247-48.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Id.</u> at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  <u>Horta v.</u>

Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721);

Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957),

cert.denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is

entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise

made admissible in evidence*") (emphasis added).

### *Discussion*

_____The FMLA was enacted by Congress in 1993, in part to address problems arising from

"inadequate job security for employees who have serious health conditions that prevent them

from working for temporary periods."  29 U.S.C. § 2601(b)(1).  The act was designed to provide

a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and

"accommodat[ing] the legitimate interests of employers."  29 U.S.C. §§ 2601(b)(1-2); see

Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §

2601(b)(1)) (holding that one of  "[t]he primary purposes of the FMLA [is] to 'balance the

demands of the workplace with the needs of families'. . . .").  The FMLA grants eligible

employees the right to take up to twelve work weeks of leave during a twelve-month period for

any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care
> for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption
> or foster care.
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee,
> if such spouse, son, daughter, or parent has a serious health condition.
> (D) Because of a serious health condition that makes the employee unable to
> perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(A-D).  At the end of the leave period, the employee has the right to be

restored to her former position or an equivalent position.  29 U.S.C. § 2614(a)(1).

In this case plaintiff is asserting only one claim under the FMLA – a claim for retaliation. An FMLA retaliation claim is contemplated by section 815.220(c) of the regulations implementing 29 U.S.C. § 2615(a).  29 C.F.R. § 825.220(c)[5]; see Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004) (cited 29 C.F.R. § 825.220(c) and noted FMLA retaliation claims arise under 29 U.S.C. § 2615(a), the interference provision of the FMLA).  To establish a prima facie case for retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave.  Conoshenti, 364 F.3d at 146.

Defendant asserts in the pending motion that this court need not reach the merits of plaintiff's claim because it is time-barred.  The parties agree that this action was filed after the two-year statute of limitations had expired.  Defendant's motion requires the court to consider only one issue: whether plaintiff submitted sufficient evidence of willfulness in order for her claim to come within the three-year statute of limitations for willful violations of the FMLA.  29

---

[5]29 C.F.R. §825.220(c) provides:
> (c) An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

U.S.C. § 2617(c)(2).[6]  Section 2617(c) of the FMLA sets forth the applicable limitations periods

for commencing a claim under the FMLA.  That section provides:

> (c) Limitation
> (1) In general
> Except as provided in paragraph (2), an action may be brought
> under this section not later than 2 years after the date of the last
> event constituting the alleged violation for which the action is
> brought.
>
> (2) Willful violation
> In the case of such action brought for a willful violation of section
> 2615 of this title, such action may be brought within 3 years of the
> date of the last event constituting the alleged violation for which
> such action is brought.

29 U.S.C. § 2617(c).  As is evident from reading section 2617(c), there are two tiers of periods of

limitations set forth.  The first limitations period is two years.  The second limitations period is

three years, but that expanded period is applicable only in the situation of a willful violation of

section 2615 of the FMLA.[7]  Neither the United States Supreme Court nor the United States

---

[6]The parties disagree as to the burden of proof.  Defendant contends that the elements of
plaintiff's claim are subject to the burden-shifting analysis adopted by the United States Supreme
Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973).   Plaintiff contends that there is
direct evidence of retaliation and that defendant must show that it would have made the same
employment decision regardless of its discriminatory animus.  The dispute over the burden of
proof applicable to the merits of plaintiff's claim, however, is not relevant and need not be
resolved by this court because, as discussed below, plaintiff's claim is time-barred.

[7]29 U.S.C. § 2615 provides:
> (a) Interference with rights
> (1) Exercise of rights
> It shall be unlawful for any employer to interfere with, restrain,
> or deny the exercise of or the attempt to exercise, any right
> provided under this subchapter.
> (2) Discrimination
> It shall be unlawful for any employer to discharge or in any
> other manner discriminate against any individual for opposing
> any practice made unlawful by this subchapter.

Court of Appeals for the Third Circuit have addressed directly the standard for determining willfulness as contemplated by the FMLA.

A two-step limitations period, similar to the two tiers of limitations periods contained in 29 U.S.C. § 2617(c), is set forth in the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA").[8]  The Supreme Court in <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S.128 (1988), considered "the meaning of the word 'willful' as used in the statute of limitations applicable to civil actions to enforce the [FLSA]." <u>Id.</u> at 129.  The Supreme Court rejected the "*Jiffy June* standard" because that standard, which would have required only that a defendant know that the FLSA was in the picture, set too low a threshold considering the nature of the two-tiered statute of limitations.  The Court noted:

---

      (b) Interference with proceedings or inquiries
        It shall be unlawful for any person to discharge or in any other manner
        discriminate against any individual because such individual--
        (1) has filed any charge, or has instituted or caused to be instituted
        any  proceeding, under or related to this subchapter;
        (2) has given, or is about to give, any information in connection
        with any inquiry or proceeding relating to any right provided under
        this subchapter; or
        (3) has testified, or is about to testify, in any inquiry or proceeding
        relating to any right provided under this subchapter.

    [8]The statute of limitations for actions under the FLSA is set forth in 29 U.S.C. § 255(a), which provides:

        (a) if the cause of action accrues on or after the date of the enactment of
        this Act [enacted May 14, 1947]--may be commenced within two years
        after the cause of action accrued, and every such action shall be forever
        barred unless commenced within two years after the cause of action
        accrued, except that a cause of action arising out of a willful violation may
        be commenced within three years after the cause of action accrued[.]

  29 U.S.C. § 255(a).

> The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations.  It is equally obvious to us that the *Jiffy June* standard of willfulness – a standard that merely requires that an employer knew that the FLSA "was in the picture"– virtually obliterates any distinction between willful and nonwillful violations.

Id. at 132-33.  The Court found that the standard it had adopted in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985), is the more appropriate standard to determine willfulness.  The standard adopted in Thurston was "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. . . ."  Id. at 133.

One of the first decisions dealing with the FMLA and whether conduct amounts to willfulness is Hillstrom v. Best Western TLC Hotel, 354 F.3d 27 (1st Cir. 2003).  In Hillstrom the United States Court of Appeals for the First Circuit considered a situation where a district court had granted summary judgment for a defendant, finding, among other things, that a violation was not willful for purposes of the FMLA's three-year statute of limitations.  In Hillstrom there were no material facts in issue.  The plaintiff had worked for almost twenty years for the defendant, which operated a hotel, eventually being promoted from a position as a night manager to general manager of the rooms division.  Another manager – the manager of the food and beverage division – had approached the president of the defendant about becoming the general manager for the defendant.  Several months after the owner declined to make that appointment, the plaintiff became ill and sought FMLA leave.  While the plaintiff was on leave, the president of the defendant appointed the other manager as the general manager.  Consequently when the plaintiff returned to work his job had changed.  He was now reporting to the other manager, who had become the general manager.  Tension developed between plaintiff and the new general manager.

The new general manager expressed dissatisfaction with the plaintiff's performance.  The

plaintiff agreed with certain, but not all, of the general manager's criticisms.  The plaintiff was

placed on a thirty-day probation period at the end of which he was terminated.  Among other

things, the plaintiff asserted a violation of the FMLA by reason of his alleged demotion upon

return to work.

The district court granted summary judgment in favor of the defendant on all claims,

including the plaintiff's FMLA claim.  The claim asserting the FMLA violation was filed more

than two years but less than three years after the alleged unlawful conduct occurred.  The plaintiff

argued that the defendant's violation of the FMLA was willful and therefore his claim was

subject to the three-years statute of limitations and should not be barred by the two-year statute of

limitations.  The court of appeals found that the standard used to determine whether conduct is

"willful" set forth in <u>McLaughlin</u> was the relevant standard to apply.

> There is every reason to apply this FLSA standard for willfulness to
> FMLA claims.  <u>McLaughlin</u>, a 1988 decision, pre-dated the 1993
> enactment of the FMLA.  The statutes use the term "willful" in similar
> ways and in identical contexts: both provide for a two-year statute of
> limitations except in cases of willful violations, when a three-year
> limitations period applies.  <u>Compare</u> 29 U.S.C. § 2617(c)(2) with <u>id.</u> §
> 255(a).  When enacting the FMLA, Congress is presumed to have known
> the definition that the Supreme Court had given to the term "willful". . . .
> In <u>Hazen Paper Co. v. Bibbins</u>, 507 U.S. 604 . . . (1993), the Court
> applied the definition of "willful" enunciated in <u>McLaughlin</u> to a provision
> of the ADEA that provides for liquidated damages in the case of willful
> violations . . . . The Court reaffirmed that "[t]he word 'willful' is widely
> used in the law, and, although it has not by any means been given a
> perfectly consistent interpretation, it is generally understood to refer to
> conduct that is not merely negligent."

<u>Id.</u> at 33-34 (quoting <u>Hazen Paper</u>, at 507 U.S. at 615)

The court of appeals concluded after reviewing the undisputed facts that plaintiff did not present evidence of a willful violation and affirmed the decision of the district court.  Other courts of appeals which have considered the question of the applicable standard for willfulness in applying the three-year statute of limitations for the FMLA have concurred with Hillstrom's analysis.  See Samuels v. Kansas City Missouri School Dist., 437 F.3d 797, 804 (8th Cir. 2006) (applied the McLaughlin standard for willfulness to the FMLA three-year statute of limitations, noting general knowledge by a defendant that the FMLA was in the picture "does not indicate a 'willful' violation of the statute"); Hoffman v. Professional Med Team, 394 F.3d 414 (6th Cir. 2005) (applied Thurston standard for willfulness to FMLA three-year statute of limitations); Porter v. New York Univ. School of Law, 392 F.3d 530 (2d Cir. 2004) (cited McLaughlin and agreed with the rationale of Hillstrom); Ricco v. Potter, 377 F.3d 599, 602 (6th Cir. 2004) ("An employer commits a willful violation of the FMLA when it acts with knowledge that its conduct is prohibited by the FMLA or with reckless disregard of the FMLA's requirements . . . .").

In Rigel v. Wilks, No. 03-971, 2006 WL 3831384 (M.D. Pa. Dec. 28, 2006), the United States District Court for the Middle District of Pennsylvania recently considered the standard for willfulness in connection with the limitations period for an FMLA claim.  In Rigel the plaintiff sought relief for, among other things, a violation of the FMLA alleging that the defendants wilfully violated his right to receive leave under the FMLA.  The district court in considering the defendants' motion for summary judgment noted that the facts reflected the lack of communication among the defendants and between defendants and the plaintiff.  The court recognized that the plaintiff would have qualified for FMLA leave if the request for FMLA leave had been properly handled.  The handling of the request was "bungled" by both sides.  The court

found that the standard set forth in <u>McLaughlin</u> was applicable and that the plaintiff had to

establish that there was an intentional violation of the FMLA by a defendant or that a defendant

acted with reckless disregard for whether its conduct violated the FMLA.  <u>Id.</u> *42.  The plaintiff,

however, only showed bungling which was not sufficient to withstand a motion for summary

judgment.  "Assuming that there was an FMLA violation, [the plaintiff] has at best shown that

his employer was either negligent in handling the FMLA leave request and removal proceedings

or incorrect in its belief that it was complying with the mandates of the law."  <u>Id.</u> * 56-57.  Under

those circumstances, the court concluded the plaintiff did not submit sufficient evidence of

willfulness.  <u>See</u> <u>Sommer v. The Vanguard Group</u>, 380 F.Supp.2d 680 (E.D. Pa. 2005) (applied

the <u>McLaughlin</u> standards for willfulness citing <u>Hillstrom</u> and <u>Hoffman</u>); <u>Ungerleider v. Fleet</u>

<u>Mort. Group of Fleet Bank</u>, 329 F.Supp.2d 343, 362-63 (D. Conn. 2004) (citing <u>McLaughlin</u> and

noted that courts often look to the FLSA when determining issues under the FMLA).

In plaintiff's response to defendant's motion for summary judgment, plaintiff articulates

the reasons why a prima facie case of retaliation has been established by the evidence adduced.

The court will assume for purposes of this opinion that plaintiff would be able to establish a

prima facie case of retaliation under the FMLA for purposes of surviving a motion for summary

judgment.  The crux of the issue under those circumstances is whether plaintiff adduced

sufficient evidence of willful conduct on the part of defendant in order to come within the three-

year statute of limitations set forth in 29 U.S.C. § 2617(c)(2).  With respect to willfulness,

plaintiff points to Simmons' involvement in the decision to terminate plaintiff, Simmons'

hostility to plaintiff, Simmons' losing of records required for plaintiff to take leave and

Simmons' refusal to grant a leave request made in January 2002 as evidence of willfulness.

Plaintiff also argues that Simmons either lied to Floyd about the extent of plaintiff's absences or the true state of the records.  Plaintiff asserts that Simmons was untruthful and made false accusations to Cooley and Floyd and failed to provide performance reviews to assist plaintiff.

Plaintiff appears to argue that since a discrimination claim requires showing of an intent to discriminate, the finding of a prima facie case arguably would suffice to show willfulness. That latter argument, however, was rejected by the Supreme Court in <u>McLaughlin</u> with respect to the standard to determine willfulness for purposes of a two-tiered statute of limitations.  To infer willfulness from the existence of a prima facie case would be to conflate the two-year statute of limitations with a three-year statute of limitations.  In other words, there would be no need for a two-year statute of limitations because all FMLA claims under that analysis would be governed by the three-year statute of limitations.  The Supreme Court in <u>McLaughlin</u>, an analogous situation, found where a two-tiered statute of limitations was enacted, like that in issue here, it is necessary to differentiate between nonwillful and willful conduct.  This court concludes the applicable standard for determining willfulness under 29 U.S.C. § 2617(c)(2) is, as was recognized in <u>Hilstrom</u> and <u>Rigel</u>, that plaintiff must adduce evidence "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute . . . ." <u>Thurston</u>, 469 U.S. at 133.

Having reviewed the evidence of record, the court concludes that while plaintiff may have presented sufficient evidence of a prima facie case for retaliation, plaintiff did not adduce sufficient evidence of willfulness.  At best the evidence shows the conduct of Simmons, plaintiff's supervisor, to be negligent and hostile toward plaintiff.  The record reflects that the hostility between Simmons and Seifert existed for many years.  Indeed, plaintiff complained

about Simmons in 1997 and recognized that there was mutual distrust.  The record is also replete

with conduct of hostility and alleged lying by Simons predating plaintiff's taking of FMLA leave

by several years.  The question of Seifert's accounting for leave also predates by several years her

taking of FMLA leave.  In 1996, Simmons perceived that Seifert was arriving late, leaving early,

disappearing from the office and not putting in leave slips.  The failure to complete performance

reviews had occurred for several years prior to plaintiff's requesting and taking FMLA leave.

The evidence of record is not sufficient for a reasonable finder of fact to conclude that

there was an intent to violate the FMLA or that defendant showed reckless disregard for whether

its termination of plaintiff was prohibited by the FMLA.  Here, plaintiff was advised of the

opportunity to seek leave under the FMLA and, in fact, in 2000 and 2001 she was reminded

about the opportunity to take FMLA leave.  Plaintiff acknowledged that Floyd was supportive of

her request for leave, including her request for FMLA leave.  She was granted FMLA leave in

March 2001 which was effective through the period ending March 9, 2001.  Plaintiff points to

her request for leave in January 2002, but she fails to recognize that she was granted the very

leave she was requesting through March 2002.  Under those circumstances, the court cannot find

that there was sufficient evidence adduced of an intent to violate the FMLA or reckless disregard

for defendant's obligations under the FMLA.

In addition, plaintiff points to the reference to her FMLA leave in the termination letter as

arguably showing an intent of defendant to violate the FMLA or its reckless disregard for its

obligations under the FMLA.  The reference in the termination letter to the FMLA leave,

however, has to be viewed in the context of the letter.  Her taking of FMLA leave was part of the

background necessary to account for her absences.  The time she took leave that was not part of

her FMLA leave was also noted.  While plaintiff points to discrepancies between what was reported prior to the investigation with respect to her leave times and the actual findings in the investigation, those discrepancies do not rise to the level of showing intentional or reckless disregard for her rights under the FMLA.  At best, they show an ineptitude on the part of Simmons.  Perhaps the most compelling factor that would preclude a finding of willfulness is that defendant's human resources department conducted an investigation with respect to plaintiff's usage of leave in 2001 and 2002.  Floyd reviewed those results and concluded that the discrepancies were sufficiently egregious to warrant plaintiff's termination.  Also of note is that plaintiff was absent in 2002 on numerous days for which no FMLA leave was requested, i.e, no FMLA leave was requested with respect to her father's illness and no medical certificate was submitted for any of her absences during March or April 2002.

Considering those circumstances reflected in the record, the court finds that while ineptitude and hostility may have existed with respect to plaintiff in the work place, the ineptitude and hostility predated her request for FMLA leave and the investigation demonstrated that the employer was seeking to act in an appropriate manner.  The evidence of record is simply insufficient to enable a reasonable finder of fact to conclude that there was a willful violation of section 2615 of the FMLA by defendant.

**Conclusion**

After reviewing the undisputed material facts of record, viewing any disputed facts of record in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of the nonmoving party, the court determines that insufficient evidence of willfulness was adduced by plaintiff and that, based upon the record before the court, a reasonable fact finder

could not conclude that there was a willful violation of the FMLA by defendant.  Under these

circumstances, plaintiff's claim is subject to the two-year statute of limitations set forth in 29

U.S.C. § 2617(c)(1) and is time-barred.  Summary judgment will be granted in favor of

defendant.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: September 27, 2007

cc:      Counsel of record

27